RIVES, J.
The questions that have been *610 made in this case, and discussed at such length, grow out of a deed of trust which the appellant gave on the 19th September, 1860, on his house and lot in the city of Richmond, then recently purchased and conveyed to him by deed of the same date, to secure the unpaid purchase money, for which he had executed ten negotiable notes, falling due at successive intervals of six months, and thus extending from March the 22d, 1861, to September 22d, 1865. The first four of these notes were paid; the remaining six were passed in January, 1862, for value to the appellee Franklin Stearns, who afterwards, in view of the rapid depreciation of the Confederate currency, refrained from any demand of payment till the restoration of Federal authority, and the consequent return of Federal money. *After waiting with the appellant for the space of a year thereafter, .and six months after the last note •became due, he required the trustees to sell. Accordingly, they advertised the property for sale on the 4th day of May, 1866. To prevent this sale, the appellant filed his bill, accompanied by copies of said trust deed and said advertisement as exhibits A and B, and averring, that “said sale was, under the circumstances, inequitable, unjust and illegal.” No other reason was assigned for this assertion except this, namely: “At the last session of the legislature of Virginia, the General Assembly of Virginia, impressed with a sense of the hardship which would result from the forced sales of property, resulting in unjust and ruinous sacrifice, expressly enacted that there should not be any sales under deeds of trust for the payment of money (except in certain specified cases, of which this is not one,) until the 1st day of January, 1868.” The bill concluded with a prayer for an injunction against the sale, which was awarded on the 24th of April, and the subpoena executed on defendants on 1st May, 1866.
On the 4th of June, 1866, the defendants filed their several answers; the trustees denying for themselves any knowledge of the allegations of the bill, and all interest in the suit, except as mere trustees; and the appellee Stearns, responding to what he terms “the only material allegation in the bill, namely, the act of the General Assembly forbidding sales under irust deeds until the 1st of January, 1868, takes issue upon that law as void under the constitution of Virginia and the constitution of the United States. Previous to the filing of these answers, to wit, on the 2d June, 1866, a motion was first made to dissolve; and was successively continued till the final hearing on the 17th day of January, 1867, which resulted in the dissolution of the injunction and the dismission of the bill.
But, in the meantime, when the answers were filed *on 4th of June, 1866, a general replication was entered thereto on behalf of the plaintiff, 'and on his motion, by counsel, the cause was set for hearing.
I have been thus minute and explicit in tracing the successive stages of this cause that I might more clearly dispose of two preliminarj' objections to this decree, that seem to have been advanced for the first time in this court. The first of these is predicated of the fact that the court had possession of the case simply on the motion to dissolve, and overlooks the prior and material entry, by which the plaintiff had set down the cause for hearing. But if it be conceded that there is a defect of clerical form and regularity, in which this prior entry has been ignored, and the cause brought on apparently to a hearing on a motion to dissolve, it is assuredly such a matter as it behooved the party affected thereby to notice in the court below, where it admitted of easy correction, and is not an error of substance, to be availed of on appeal.
The second of these objections applies to the lack of explicitness in the terms of the advertisement; and we are asked to view it now in the light of authorities upon the invalidity of sales made in disregard of the terms of the power. But it is a sufficient answer to say that no such question or issue has been made in this case. This advertisement is made an exhibit with the bill; no intimation of its insufficiency or illegality escapes the complainant; he does not allege there, as he now does here, that the advertisement should state the notes and the amounts due, so as to notify and prepare bidders for the sale. The bill itself discloses his full knowledge on that subject, and his ability to protect himself and his friends from being ensnared by the vagueness of the notice. It is, therefore, too late to start this objection for the first time in this court. However such an objection might weigh in the event of a sale and actual damage resulting from an insufficient advertisement of its terms, it is wholly inapplicable to a case like the present, where the object of the bill is to prevent a sale on grounds wholly irrespective of the advertisement. Such objections are virtually waived or abandoned by the appellant in the mode in which he has chosen to conduct and manage his cause, and cannot now be availed of in this court.
Having thus disposed of these assignments of error, we are brought to the investigation of the single question in this cause. On this alone it was argued, heard and decided below. No excuse, however ingeniously suggested, exists to avoid it here. It must be met under the pleadings and the decree. It is a question of magnitude, not only because of. its consequences to the parties and its bearings upon the community at large, but more especially because of the delicate and responsible nature of the function required of this court. True, it is not a question of dimensions corresponding with the extensive range of the argument. It has been discussed as if involving all the provisions of the act of March 2, 1866. No ^special attention was *611 given to the particular clause of the act embracing sales under deeds of trust; nor any enquiry made to^distinguish it from the suspension of judicial process under the same act. Both in the argument here, and the opinion of the court below, these provisions of the act were, for the most part, confounded, and assumed to rest upon the same ground; or, at any rate, if the discrimination was incidentally suggested, it was not developed with that clearness and precision to display the impropriety or avoid the necessity of pronouncing on the constitutionality of the whole law. Had more attention been paid to this distinction, and greater pains taken to treat this particular enactment separately and apart from other parts of the statute not involved in this controversy, I venture to suggest it would have greatly abridged the argu-meat, and ^involved far less of the metaphysical refinements and speculations, that have confused the opinions of the courts on the difference between obligation and remedy of contracts to such a degree as to leave the doctrine on that point in a most unsatisfactory state of uncertainty and perplexity. It is, however, the manifest duty of this court to confine itself to the issue made by the pleadings; and to abstain from expressions or intimations of opinion which would be extra-judicial, and might be deemed a departure from the reserve usual on such occasions.
Our enquiries must, therefore, be confined to that clause of the statute forbidding sales under deeds of trust until the 1st of January, 1868, which period was extended by a subsequent act to the 1st of January, 1869. This throws out of our consideration the vexed question of the authority of the legislature over judicial process and remedies to enforce contracts, and will limit our investigations to the plainer doctrine of legislative action upon the obligation, as contra-distinguished from the ■remedy arising out of contracts. This position, however, I shall seek to put in a clearer light in a subsequent part of this investigation; for the present, I desire to preclude all or any expectation of my being betrayed into any opinion upon such parts of this statute as are in no wise involved in this controversy; and to express my belief that a satisfactory decision of this cause can be reached without embarrassing ourselves with the intricate and conflicting views to which I have alluded, and without undertaking to decide the constitutionality or unconstitutionality of the whole statute.
It has been remarked upon as a curious circumstance, that the framers of the constitution, in laying down barriers against legislative invasions of private rights, should have omitted to provide any positive guarantee or specific protection ; should have attached no sanction or penalty, *and been silent as to the mode in which the fact of violation was to be established or the prohibition enforced. Sedgwick on Stat. and Const. Haw, p. 477. But it would seem that the nullity of a law repugnant to the constitution was enough to maintain this bulwark against legislative encroachments. A resort to the courts must be had to test the validity or assert the supremacy of laws; and the interests of persons affected by them furnish an active motive and an imperious necessity for 'such a resort. In this way, the judiciary takes cognizance of such cases, and is clothed with authority to prevent the ministerial officers of justice from obeying an act of the Legislature transcending its prescribed powers, and for that reason void. ’ Hence, it is now well settled, that it falls within the peculiar province of the judiciary to protect the citizen against all infractions of the constitution touching his rights ;' and no higher protection or guarantee, it seems to me, could be given than is found in the practical administration of justice under the restraints of the constitution and the solemn sanctions of an official oath to support it. While, therefore, a due respect to the Legislature exacts of the judiciary the cautious rule, which it has always professed and acted on, of exerting its high prerogative of denouncing a law as unconstitutional only in clear cases, and of resolving all doubts in favor of the law, nevertheless it would be a culpable surrender of its independent judgment and co-ordinate authority if it could be led by motives of deference or delicacy on the one hand, or the fears of responsibility on the other, to find shifts or excuses for denying the protection which the fundamental law of the land ordains to private rights against legislative violations. I would magnify, 'rather than underrate, the respect due from this court to the Assembly, whose laws it administers; that sentiment, however, inspires no blind and servile homage; it exacts only that respectful consideration *which, while conceding the full measure of deference to be paid to the Legislature, leaves to this court absolute freedom of deliberation upon its acts when brought under its review.
These considerations are much enhanced in this case by the caution and deliberation which marked the passage of this act. If any part of it be repugnant to those constitutions, which the members of the Assembly as well as ourselves are bound to observe, it was because of no inadvertence on their part, nor of any failure to examine the grave challenge of their competency in the premises. The able and ingenious reports by which this law was advocated, proceeded from a committee comprising the highest legal talent of the State, and who advanced a new theory for the justification of the law. The preamble of the act itself attests the direct and special consideration which the Assembly gave to the questions we are about to examine. It recites, that “while this General Assembly recognize their imperative duty to respect and obey the constitutional provisions which prohibit the enactment of any law impairing the obligation of contracts, they believe that, when construed with reference to' the *612 objects of those provisions, and in the light of principles recognized and acted upon by the courts of justice at the time of the adoption of the constitution of the United States, as well as before and since that time, those provisions do not forbid them from granting a temporary suspension of remedies in such a state of things as the present, in order to prevent the cruel and ruinous results which would ensue without such interposition, and especially as it only requires that creditors, while their right to ultimate payment is held inviolable, shall submit to a .course to which they might well be constrained by the instincts of natural justice and humanity.” No doubt, therefore, exists that the Assembly duly considered *and decided for themselves this constitutional question, and that the passage of the law is to be taken as their judgment that there is nothing in it in conflict with the constitution of the United States or the constitution of this State. This fact truly admo'riishes us to the greater caution in our deliberations and the closer scrutiny into our reasonings; but it cannot exonerate us from the duty of following our convictions 'where, by the constitution, public interests and private rights are made to abide our independent judgments in the last resort.
. Thp' first step in our enquiries should be, to acquire a clear and definite idea of the constitutional prohibition. Its insertion in the -constitution of the United States was to preserve a uniform sanctity of contracts in all' the States. How it came, in almost the same language, to find a place in the State constitutions is not so clear. It appears in the Federal constitution as a restriction upon the States, which would seem to supersede the necessity of a similar provision by the States. But doubtless the principle had been canonized as a fundamental guarantee 'of private rights, and along with the interdict upon bills of attainder and ex post facto laws been ranged among the indisputable maxims of individual right and liberty, and the essential barrier for their protection against the invasions of the Legislature. It was first introduced into the constitution of this State at its revision and amendment" in 1829-30, and was reported among the provisions of the legislative department by Mr. Madison, who had borne so conspicuous a part in the formation and adoption of the Federal constitution. Our constitution, as well as the constitutions of a large majority of the States, adopts the language of the constitution of the United States, namely, “any law impairing the obligation of contracts.” In Ohio, Indiana and Illinois, the term “obligation” is substituted by “validity,” and in Kentucky and Pennsylvania ^dropped, so as to leave the clause, “any law impairing contracts.” Ilowever varied in phraseology, it is substantially the same provision, and aims at the accomplishment of the same object. In Ogden v. Saunders, 12 Wheat. R. 256, Justice Washington seeks to establish “a distinction between a law which impairs a contract and one which impairs its obligation. ” This case, indeed, abounds with subtle reasonings and metaphysical refinements, which are rather curious than practical; but it is sufficient for our purpose to treat this language as designed to secure the inviolability of contracts. This is denied by none. The attempts that have been made through the resources of a learned etymology to explain this phrase seem to have darkened the sense, and to have given rise to the charge of obscurity. There is no use in straining after an occult meaning. Its plain import to the common understanding is more reliable and far better than the subtleties of scholastic derivation. Chief Justice Marshall has well and summarily disposed of all these refinements by tersely declaring: “It would seem diffi- ■ cult to substitute words which are more intelligible or less liable to misconstruction. ’’ Sturges v. Crowninshield, 4 Wheat. R. 122, 197. He further adds: “The law binds him to perform his undertaking; and this is, of course, the obligation of his contract.” The same idea is conveyed in apt words by Justice Curtis in Curran v. State of Arkansas, 15 How. U. S. R. 304: “The obligation of a contract in the. sense in which these words are used in the constitution is that duty of performing it, which is recognized and enforced by the laws.” _These definitions of course exclude the 'obligation growing out of the moral and natural law, as resting upon the sanctions of conscience and the universal governing principles of our nature and being. The former is beyond the reach of the human law-giver; and the latter, while still controlling the intercourse *of nations, is substituted in society by civil or municipal law. Still, our contracts are sensibly influenced by considerations pertaining to their moral or natural obligation on the one hand, and their legal obligation on the other. Thus, in our dealings, what a different value do we attach to the pecuniary obligation of a man of probity, punctuality and means, and of another, doubtful in his circumstances and careless of his engagements? In the former case, there will be no thought of a day in court or the services of a sheriff; in the latter, it would be imprudent to reckon upon payment save at the end of the law; so that it is not without reason that Justice Johnson (Ogden v. Saunders) contended, that “the obligation of contracts will be found to be measured neither by the moral law alone, nor by the universal law, nor by the laws of society alone, but by a combination of the three; an operation in which the moral law is explained and applied by the law of nature, and both modified and adapted to the emergencies of society by positive law.” Story on Const. § 1378.
Let us now advance another step in this enquiry, and consider what is meant by the *613 term “impairing.” To this end, it will be useful to advert briefly to the history of this constitutional provision, and the mis-chiefs which led to it. In reply to the question, what were the laws in the mind of the framers of this provision? Judge Marshall (Sturges v. Crowninshield, 4 Wheat. R. 122, 204,) said: “They were such-as grew out of the general distress following the war. Paper money was issued; worthless lands and other property of no use to the creditor were made a tender, and the time of payment stipulated in the contract was extended by law. ’ ’ In his Iyife of Washington, the state of parties upon these measures is thus graphically sketched: “The discontents and uneasiness arising, in a great measure, from the embarrassments *in which a great number of individuals were involved continued to become more extensive. At length, two great parties were formed in every State, which were distinctly marked, and which pursued distinct objects with systematic arrangement. The one struggled with unabated zeal for the exact observance of public and private engagements. The distresses of individuals were, they thought, to be only alleviated by industry and frugality ; not by the relaxation of the laws or a sacrifice of the rights of others. The other party marked out for itself a more indulgent course. Viewing with extreme tenderness the case of the debtor, their efforts were unceasingly directed to his relief. To exact a faithful compliance with contracts was, in their opinion, a measure too harsh to be insisted on, and was one which the people would not bear. They were uniformly in favor of relaxing the administration of justice and of affording facilities for the payment of debts, or of suspending their collection and of remitting taxes. In many States the parties last mentioned constituted a decided majority of the people, and in all of them it was very powerful. The emission of paper money; the delay of legal proceedings, and the suspension of the collection of taxes, were the fruits of their rule wherever they were completely dominant.” Mr. Madison’s testimony is to the same effect: “In the internal administration of the States, a violation of contracts had become familiar in the form of depreciated paper made a legal tender; of property substituted for money; of instalment laws, and of the occlusion of courts of justice, although- evident that all such interferences affected the rights of other States, relatively creditors, as well as citizen creditors within the States. ’ ’ In the State of North Carolina, smarting under this extreme policy of relief, this prohibition of the constitution was specially advocated by a member of the convention, on the ground that a sister State *could not again do what they had heretofore done — “make pine barren acts to discharge their debts ; declare that our citizens shall be paid in sterile, inarable lands at an extravagant price; pass instalment laws, procrastinating the payment of debts due from their citizens for years.”
This contemporaneous history of the legislation out of which this restriction grew, and these declarations of framers of the constitution, conclusively prove that this clause was designed to interdict to the States all legislative interference with contracts, such as had so disastrously relaxed the morals, interrupted the commerce, and disturbed the harmony of the States. For obvious reasons, no attempt was made to enumerate cases within this prohibition ; but its terms so comprehensive as clearly to embrace the antecedent mischiefs, to which it was specially directed, as well as to provide against future evils of the same kind. The Supreme Court of the United States has, in a long series of decisions, announced their conclusion “that any law which enlarges, abridges or in any manner changes the intentions of the parties, resulting from the stipulations in the contract, necessarily impairs it. The manner or degree in which this change is effected can in no respect influence the conclusion; for whether the law affect the validity, the construction, the duration, the discharge or the evidence of the contract, it impairs the obligation, though it may not do so to the same extent in all the supposed cases. Any deviation from its terms by postponing or accelerating the period of performance which it prescribes ; imposing conditions not expressed in the contract; or dispensing with the performance of those which are a part of the contract, however minute or apparently immaterial in their effect, impairs its obligation. ” Ogden v. Saunders, 12 Wheat. R. 213, 327; Green v. Biddle, 8 Wheat. R. 1, 84. In some of the judicial expositions of this clause, it is to be regretted *that an incautious qualification of this term “impairing” has crept into the language of the courts, for which I can find no warrant. In that branch of the doctrine, which I shall have no occasion to examine, touching the distinction between obligation and remedy, it is frequently said that the latter may be changed so that it does not materially impair the former. This epithet is vague, uncertain and calculated to confuse and mislead. A better guide is afforded us by Justice Woodbury, in Planters’ Bank v. Sharp & al., 6 How. U. S. R. 301, 327, where he says: “One of the tests that a contract has been impaired is, that its value has by legislation been diminished. It is not, by the constitution, to be impaired at all. This is not a question of degree, or manner, or cause, but of encroaching in any respect on its obligation, dispensing with any part of its force. ’ ’ The final term of this prohibitory clause requires neither explanation nor comment. The meaning of “contract” is well understood, and is not open to disputation. It is only necessary to add, that it applies to all contracts, whether verbal or writtep, express or implied, executory or executed, whether between individuals, corporations, States and individuals, or between separate *614 States.' It may as well exist in the form of a grant, .public or private, as of mutual undertakings. Whatsoever its character may be, it is secure from all legislative control or modification; and the public faith is solemnly pledged, under all circumstances and in spite of all temptations, to uphold its integrity.
In these comments on this clause of the constitution, I have ventured on no principle which is not conceded in all the cases in which this restriction has been judicial^ considered. I am not aware of any authority against the positions I have taken; nor have I so far run counter, in any respect, td the common concessions of the opposing ’’'counsel in this case. And yet I shall apply no other doctrine to the solution of our present enquiries. The variance and the difficulty will, doubtless, occur'in determining the state of-facts, to wliich this conceded law shall be applied. Nor does it seem to me there can be any serioiis discrepancy of ' views in the ascertainment of the real nature and effect of the contract in this case. Had it pleased the pa'fties to confine their dealings to the conveyance of the tenement on the one hand,'and the taking of the negotiable notes on the other, a very different question would exist' as to "the means of enforcing payment and as to legislative control over such remedies. In such an event it would have been in the contemplation of the parties that satisfaction, if not voluntary, could only be coerced by a resort to the courts. But the parties did not stop at this point. The vendor had not 'the' security he wished. A supplementary, though distinct contract was entered into. It' consists of the deed of trust of the 19th September, 1860. It has the dignity and solemnity of a sealed instrument. The appellant thereby conveys to Jas. M. Taylor and John Bnders (trustees) his house and lot in trust to secure-to John M. Gregory the payment of the sum of $13,;299.55, due by ten negotiable notes, drawn ]iy the grantor and payable to said Gregory, with the following stipulation, viz:'“In' the event that default shall be made in the payment of either of the above mentioned notes as they become due and payable, then the trustees, or either of them, on being required so to do by the said John M. Gregory, his executors, administrators or assigns, shall sell the property hereby conveyed. And it is covenanted and agreed between the parties aforesaid, that in case of a sale, the same shall be made after first advertising the time, place and terms thereof for fifteen days in some newspaper published in the city of Richmond, and upon the following terms, ' to wit: Bor cash as to so much *of the proceeds as may be necessary to defray the expenses of executing this trust, the fees for drawing and recording this deed, if then unpaid, and to discharge the amount of mo'ney, principal, interest and charges', then payablé upon the said notes; and if at the time of such sale any of said notes shall not have become due and payable, and the purchase money be sufficient, such part or parts of the said purchase money as will be sufficient to pay off and discharge such remaining note or notes shall be made payable at such time or times as the said remaining note or notes will become due, the payment of which part or parts shall be properly secured; and if there be any residue of said purchase money, the same shall be made payable at such time, and be secured in such manner, as the said George A. W. Taylor, his executors, administrators or assigns shall prescribe and direct; or in case of his or their failure to' give such direction, at such time and in such manner as the said trustees or either' of them shall think fit.” Here it will be seen that the debtor; who now prays the benefit of the stay law, had contracted with his creditor and his assigns for all the means and conditions whereby payment was to be made, by a sale of the property. The' deed established all the agencies for the execution of the trust. Unlike a mortgage, it contemplated no day in court for foreclosure or redemption; nor sale under the direction and terms of the court, and by its officers. But its design was to avoid the processes of the law, and to confide to impartial agents summary means of realizing the objects of the trust. Had the parties, by the nature of their agreement, as in case of a mortgage, been thrown upon the courts for redress, they might have been amenable to the control, which the legislature possesses over judicial remedies; but when they have, by their own stipulations and for very obvious reasons, sought to preclude themselves from such a resort, the debtor cannot *avail himself of this-suspension of sale without altering the_ terms of his contract and violating the intentions with which it was entered into. What is a deed of trust? It is a form of security which has, in our practice, superseded the mortgage, and doubtless for the very reason that it does not require the intervention of the courts. The introduction of trustees as impartial agents of the creditor and debtor, admits of a convenient, cheap and speedy execution of the trust, and involves none of the expenses and delays attendant upon mortgages;
At an early period it met with some resistance from the court and the bar, though feeble and ineffectual. It was depreciated as an engine of oppression in the hands of the creditor. It was denounced as a pocket-judgment. Where the creditor was trustee, it lost its peculiar character, and was treated as a mortgage. Upon the false assumption that the trustee was but the agent of the creditor, it was urged in argument upon the court in the case of Moss v. Norvell, 3 Munf. 170, that deeds of trust were nothing but mortgages, and could only be enforced by will in equity. But this pretension of counsel seems to have received no countenance from the court. It is now a favorite security for the payment of money, closely interwoven with the transactions of business, and firmly established by the practice *615 of the county and the sanction of the courts. It has, doubtless, aided credit, facilitated the collection of debts, and saved to the debtor the costs of legal proceedings. But if its convenience and advantages were less, and its evils overweighed these, there would be nothing in such considerations to loosen the bonds which the debtor has chosen to put upon himself. It is eminently a self-executing contract. All the instru-mentalities are appointed by it for its final discharge according to the declared intentions of the parties. The deed now before us is Taylor’s contract that, upon default, a sale of his '^property shall be had, under prescribed terms, for the payment of the creditor or his assigns, &c. The trustees and creditor are purchasers for value. The latter has the privilege of requiring the former, under the stipulated terms and conditions, to make his money by a sale; and the grantor in the deed has obliged himself thereto by his own deliberate covenants. How, then, can that sale, when properly ordered, be suspended for a fixed term, without violating the intentions of the parties and destroying the obligations of their contract ? Shall it be said that a sale is a remedy, that may be likened to legal process, and as such liable to be changed and modified by the Legislature? If so, there is at least this material difference, that it is a remedy of the party’s own appointment, and the very essence of his contract. It cannot be segregated from it and treated as an extrinsic remedy within the pale of legislative jurisdiction. Strip from a deed of trust this feature of sale, and it is meaningless. It loses its characteristic and vital principle. The whole deed is one entire contract, all whose covenants are inseparable, and have a common relation and bearing upon the main central design of the instrument, namely, the enforcement of the trust in pais without suit at law or in equity. But suppose this version is wrong, and that you may separate it into — 1. A lien for the security of the debt; and 2. A remedy for its collection. I am still at a loss for any real, substantial analogy to the judicial remedies, which are exempted, in a certain sense and with certain qualifications, from this prohibitory clause. The one arises out of the contract itself; the others are the offspring of the legislative will, and pertain to the judicial system of the State. From this analysis of this instrument, I infer with confidence that there is no foundation for the argument of the appellant’s counsel, that this deed is not a contract, but nothing but a remedy, in the meaning of that controverted *and indeterminate doctrine as to the limits of legislative power over remedies as distinguished from the obligation of contracts. The authorities that were cited in support of this position —as that the recital in a deed of trust does not change the dignity of a debt thereby secured, and that there are well established principles of equitable jurisdiction over the execution of such deeds — do not tend to prove that these instruments are regarded or treated as remedies, and divested of the attributes of contracts. It is very true, as remarked by Justice Johnson in Ogden v. Saunders, that “in an advanced state of society, all contracts of men receive a relative and not a positive interpretation. The State construes them, the State applies them, the State controls them, and the State decides how far the social exercise of the rights which they give over each party can be justly asserted.” This jurisdiction, therefore, attaches to them as contracts; and it is a mistake to suppose that such judicial cognizance is at all predicated of them as remedies, or justified on any such pretext.
Here, by the special terms of the deed, and according to the intention of the parties, the sale should have taken place as advertised, on the 4th May, 1866; but the law steps in and postpones it by one act to 1st January, 1868, and by another to 1st January, 1869. Does not this intervention plainly defeat the agreement of the parties and the obligation of the contract? It was admitted in argument, that if the Legislature had undertaken to protract the maturity of the notes and the happening of the default, it would have been a usurpation of authority and an infraction of the constitution ; is it less so when the law arrests the parties, and withholds them, or either of them, from reaping the fruit of their agreement for a sale? If a material stipulation be defeated, it surely could not be said with any plausibility that the obligation *of the contract was not impaired in the meaning of this restriction. I have thus endeavored to show that this case is a peculiar one, does not involve the intricate doctrine relating to legislative changes of judicial proceedings and processes, mesne and final, and should be decided by a practical interpretation of the constitution, and the ordinary rules of reasoning. The authority of adjudicated cases can only be brought to our aid through analogy, and the application of the reason-ings employed in them. Nevertheless, it is well to examine how far the positions I have taken are fortified by authority. The case of Pool v. Young, 7 Monr. R. S88, is very pertinent to this case. It was there made a. question, whether the relief laws of Kentucky, giving an indulgence of two jears unless bank paper was received in payment, and forbidding a sale for less than three-fourths of the appraised value, could defeat the stipulations of a prior mortgage, empowering the mortgagee, on default of payment, to sell the estate for ready money; and it was held that the chancellor was bound to specifically enforce the contract by a sale for cash in hand, whether those statutes were regarded as constitutional or not; and further, that such stipulations of the parties fixing the remedy for a breach of their contract must govern the chancellor as the law of the case. The reasoning of the court is so apposite to our present investigations, that I *616 cannot refrain from submitting- the following copious extract from it: “If this case was not one peculiarly circumstanced, (as it really is), it would be sufficient for us to refer to the cases of Lapsley v. Brashear and Blair v. Williams, 4 Litt. R. 34-47, to prove that, according to the settled course of decision in this court, the plaintiff in error would not be entitled to the credit of two years secured by the act of Assembly, because that the act in this respect is in contravention of *the constitution of the United States. But it is not necessary to rest on these decisions. They show that the bare understanding that the contract, when made under existing law, includes that law in its composition, precludes the operation of such an act; but here there is no necessity of implying such an understanding, for there is an express agreement between the parties regulating and fixing the remedy between them in the mortgage, if the estate should be sold for the purpose of raising the money due. Nor is it necessary to enquire, whether the act requiring estates to be valued, and if they should not bring three-fourths of that value, directing them not to be sold at all, comes within the principles recognized in Blair, &c., v. Williams and Lapsley v. Brashear, and is therefore unconstitutional so far as it operates upon contracts made before its passage. Ror the stipulation of the parties in this instance meets that case, and excludes the application of the valuation act. In the condition to this mortgage is the following express stipulation: ‘If the said Pool shall neglect or refuse to pay any or all of the sums aforesaid as they become due to the said Young, then said Young may, by giving twenty days’ notice at the public houses in the town of Winchester, in writing, proceed to sell to the highest bidder, for ready money, from time to time, so much of said land as will meet all deficiency of consideration money, with interest and all costs; and the balance, after all is paid, shall be paid over to said Pool. ’ Now it will be seen that applying the act of indulgence by a sale for two years, unless bank paper was taken, or the valuation act either, will expressly and essentially alter and change these stipulations between the parties. Rither of these acts incorporated with and bearing upon their contract would make it read that, instead of selling for ready money, Young should sell for bank paper at a credit of three months, and for money at the end of two *years; and if the property should not sell for three-fourths of its appraised value in the opinion of commissioners appointed for that purpose, he should not sell at all. To admit a subsequent act of the Legislature thus to modify and essentially vary the written stipulations of the parties, would concede to the Legislature a power to make a new contract and destroy the old altogether — a power not assumed by the letter of the act itself, for it only professes to operate on general remedies. The stipulation of the parties applies to the remedy and regulates it; fixes its terms and its credit and what is to be taken in payment, and provides for an unconditional sale without any fixed value, except so much ready money as the estate would bring. It was competent for the parties to make such a contract. There was no law forbidding it when it was made. • It was then both fair and legal. How, then, can a Legislature change the words, sense and substance of the agreement? It is true that Young did not himself attempt to execute this stipulation without the aid of a court of equity; but this was to the benefit of his adversary, who now complains,” &c.
This extract demonstrates that that case is an authority directly in point, and was decided by the course of reasoning which I have pursued. Applying its doctrine here, I am authorized to contend that this act of March 2, 1866, makes a virtual interpolation in the contract, by which it adds a new condition, suspending the sale beyond the period of default as fixed by the parties.
I have also found another case, very closely approximating this, as far as I can judge by the abstracts of it. I regret I have not access to the report of it, and must content myself with a brief statement of it, as derived from treatises upon this subject. It is a decision from Pennsylvania, and is thus quoted in the American Law Register 1863-4, N. S. p. 107: “Where the parties to a ^contract expressly include in it the legal remedy by which it is to be enforced, the Legislature cannot pass any law to change the remedial process agreed upon. The defendant having expressly waived all stay of execution, an act giving a stay in all such cases was held unconstitutional as to such contract.” Billmeyer v. Evans, 4 Wright’s R. 324. It is somewhat more fully stated in the recent treatise of Metcalf on Contracts, p. 334, as follows: “A statute of Pennsylvania granted a stay of execution under certain conditions on all judgments or debts upon which stay of execution had been or might be waived by the debtor in any original obligation or contract upon which judgment had been or might thereafter be obtained. In a case in which debtors, by a sealed instrument, authorized an entry of judgment against them, ‘without any stay of execution after the day of payment,’ it was held that this was a release of their right to a stay of execution, and became a part of their contract, and that the Legislature could not constitutionally authorize a stay of execution beyond the limit of that contract. ’ ’ S. C. 40 Pennsylvania State R. 324.
It seems to me that the parties here, by agreeing upon agencies exterior to the courts for final satisfaction, as effectually precluded any interference therewith by law as if they had expressly bound themselves not to take advantage of any subsequent legislation in conflict with their express understanding. The case would not be at all stronger if the parties, by reference to past or anticipated legislation, had stipulated that it should in no wise *617 affect their agreement. They had a constitutional guarantee for the exemption of their contract from legislative infraction; and a positive covenant on their part to that end would have been merely supererogatory, and would have imparted no additional sanction to the contract. It is on this ground I invoke the authority of that case to sustain the *views I have advanced. I am further sustained in this position by the language of the Supreme Court in McCracken v. Hayward, 2 How. U. S. R. 608: “If the defendant,” says Justice Baldwin, “had made such an agreement as to authorize a sale of his property, which should be levied on by the sheriff, for such price as should be bid for it at a fair public sale on reasonable notice, it would have conferred on the plaintiff a right which the constitution made inviolable ; and it can make no difference whether such right is conferred by the terms or the law of the contract.”
In seeking for a practical test to ascertain whether a law pertains to the remedy or' obligation of a contract, I have not found a better one than is furnished in a case cited and relied on by the appellant’s counsel—Morse v. Goold & als., 1 Ken. R. 281. In that case, an act exempting certain property from sale on execution for debts contracted prior to its passage, was held to be constitutional because it modifies the remedy, and neither destroys it nor substantially impairs its efficiency. Denio, J., in delivering the opinion of the court, points to this as a guide to determine the action of the law upon the obligation: 1 ‘The most obvious method by which a contract may be impaired by legislation would be the alteration of some of its terms or provisions, so that, assuming the validity of the law, the parties would be relieved from something which they had contracted to do, or would be obliged to do something which the contract did not originally require.” Adopting this test, is there any question that Taylor is relieved by this law from the sale of his property, for which he had covenanted, and Gregory’s assignee obliged to wait for his jnoney beyond the time ag-reed upon?
The deed of trust, as I have shown, is so peculiar to this State that the foregoing are the most striking illustrations *and confirmations of my views that I have found among the numerous adjudications on the subject that I have examined. But this instrument is so nearly akin to a mortgage, differing only in the intervention of trustees, and its capacity to be executed without suit, we may consider it as ruled by the leading case of Bronson v. Kinzie, 1 How. U. S. R. 311. It was there held, that a State law passed subsequently to the execution of a mortgage, which declares that the equitable estate of the mortgagor shall not be extinguished for twelve months after a sale under a decree in chancery, and which prevents any sale unless two-thirds of the amount at which the property has been valued by appraisers shall be bid therefor, is within the clause of the constitution of the United States prohibiting a State from passing a law impairing the obligation of contracts.
There was a peculiar feature in this mortgage, whereby the mortgagee, on default of payment, was authorized to enter on the premises and sell them at public auction, and to retain out of the money thus raised the amount due, and to pay the overplus, if any, to the mortgagor. This might seem to approach more nearly to the case of our trust deed; but inasmuch as a court of equity would view with jealousy the action of the creditor in such a position, and intervene on a reasonable pretext to restrain him from damaging his debtor, this feature of the contract was only incidentally noticed. It is thus treated in the opinion of the court: “In the case before us, the conflict of these laws with the obligations of the contract is made the more evident by an express covenant contained in the instrument itself, whereby the mortgagee, in default of payment, was authorized to enter on the premises and sell them at public auction, and to retain out of the money thus raised the amount due, and to pay the overplus, if any, to the mortgagor. The difference between the right annexed by *law and that given by this covenant consists in this, that in the former case, the right of sale must be exercised under the directions of the court of chancery upon such terms as it shall prescribe, and the sale made by an agent of the court; in the latter, the sale is to be made by the party himself. But even under this covenant, the sale made by the party is so far subject to the supervision of the court that it will be set aside and a new ordered, if reasonable notice is not given, or if the proceedings be regarded in any respect as contrary to equity and justice. There is, therefore, in truth, but little material difference between the rights of the mortgagee, with or without this covenant. The distinction consists rather in the form of the remedy than in the substantial right,” &c. But I submit, had the sale been devolved, as under our trust deed, Upon a disinterested third party, regarded as the agent of both debtor and creditor, this covenant would have been deemed by the court deciding this case, if not conclusive of it, at least far more- significant and decisive. But the gist of this decision was the incompetency of the Legislature to enlarge the estate of a mortgagor after decree of foreclosure, or to clog the sale with conditions that might suspend or defeat it. This, too, was where the remedies sprung from the courts, and were necessarily ordained by the Legislature; and in this respect, it was materially dissimilar from the case at bár, where the parties had instituted their own remedies by private contract and had avoided all recourse to law.
The principle of this decision was extended to the case of an execution in McCracken v. Hayward, 2 How. U. S. R. 608. *618 It was decided in that case, that a law of Illinois, forbidding' a sale under execution unless the property brought two-thirds of its valuation according to the opinion of three householders, was unconstitutional and void. These two cases have been followed and approved by a *long series of decisions of the Supreme
Court. Gantly’s lessees v. Ewing, 3 How. U. S. R. 707; Planters’ Bank v. Sharp, 6 How. U. S. R. 301; Curran v. State of Arkansas, 15 How. U. S. R. 319; Howard v. Bubgee, 24 How. U. S. R. 461; Hawthorne v. Califf, 2 Wall. U. S. R. 10. Prom these authorities, and nearly in their language, I deduce the settled rule of that court to be this: That .wherever a subsequent law affects to diminish the duty or to impair the right, it necessarily bears on the obligation of the contract in favor of one party to the injury of the other; hence any law which, in its operation, amounts to a denial or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the constitution; and where-ever a sale is required by the terms or law of a contract, no law can obstruct or clog it with new conditions without affecting the obligation of the contract; for it can be enforced only by a sale, and the prevention of such sale is a denial of a right. We are bound by these decisions in the interpretation of the constitution of the United States, and need not go further for authority. But the preponderance of authority from the courts of our sister States is to the same effect. State v. Carew, 13 Richardson R. 498; (Ex parte G. F. Pollard and Ex parte M. L. Woods, from Alabama, and the decision of Judge Yerger of Mississippi, in Sadler v. Whittington, &c., affirmed by the High Court of Errors, reported in newspapers) Jones v. Crittenden, 1 Car. Law Repository 385; Townsend v. Townsend, Peck R. 1; Lapsley v. Brashear, 4 Litt. R. 47, and Blair v. Williams, Id. 34. The cases of McCormick v. Rousck, 3 Am. E. Reg. N. S. 93 (Iowa); Mede v. Hand, (Dist. Ct. of Kansas) 5 Am. B. Reg. 82, and Baumbach v. Bade, 9 Wisconsin R. 559, all proceed upon the distinction between remedy and obligation, which I have shown to be irrelevant to the case in *hand; and concede the authority of Bronson v. Kinzie & als. In like manner, the case of Chadwick v. Moore, 8 Watts & Serg. R. 49, so much relied on by the appellant’s counsel, proceeds upon the same ground. Chief Justice Gibson sustains the constitutionality of a Pennsylvania statute suspending for a year a sale under execution where two-thirds of the appraised value was not bid, on the ground that the suspension was for a limited time, and distinguishes it from McCracken v. Hayward, because the statute of Illinois had no such limitation; its denial of execution was perpetual, except on terms not originally contemplated; and, therefore, it not merely impeded the remedy, but changed the condition of the'right. There was a peculiar consideration, however, which swayed the mind of this able judge, and was stated by him in these words: “The case is by no means a clear one, and as the decision of it involves the validity of other acts of the same stamp, it is worthy of being brought before the Supreme Court of the nation. To put the case in train for that, it would be necessary for us to sustain the statute at all events; for the appellate jurisdiction of that court extends no further than to cases in which the judgment is in favor of the legislation or authority, to which the Federal constitution or an act of Congress is supposed to be repugnant; in other words, it extends no further than is necessary to maintain the supremacy of Federal legislation.”
I have thus reviewed and cited the leading decisions, Federal and State, upon the doctrines I have been discussing, and I cannot but regard that the decided weight of authority is on the side of the appellee in this controversy. But another view of this subject has been submitted in the two reports of the House Committee of Courts of Justice, one of which constitutes a part of this record; and the other was given us in the argument. They are an authoritative exposition of the views of the *Begislature in the passage of this stay law, and therefore demand a special notice. Their theory, as I have already said, is original, and is not found in any of the numerous adjudications upon this subject. It puts the legitimacy of such legislation upon analogy to the authority of courts of law and equity to restrain the creditor in his remedies in certain given-cases ; as for instance, where a sheriff is required to return, “no sale for want of bidders;” where between vendors and purchasers, “time is not of the essence of the contract;” where courts of equity intervene to arrest a sale till the amount and priorities of rival incumbrances are settled, and a cloud of title removed, and to set aside sales for inadequacy of price, to reopen biddings, &c. — in all which cases the creditor is delayed. It is contended, that “it would be an anomaly to leave the courts free, by what is mere judicial legislation, to impair the obligation of contracts in this feature of time, and yet to deny this power within the same proper limits of principle to the legitimate possessors of all legislative power, the Begislatures themselves. To enact this stay in the collection of debts is, says the committee, “but doing that broadcast where a broadcast necessity exists, which the judiciary would do substantially in the individual cases as they came before it;” and further, on this principle of legislative power, “to do broadcast what courts do in individual cases, ” the committee seek to justify this stay in the collection of debts “by these examples of the extent to which judicial tribunals will delay creditors and suspend their legal remedies to prevent a sacrifice of the debtor’s property.” This is a literal and concise statement of the plausible and ingenious defence that has *619 been made of this law by this able committee. With entire respect and deference to them, I must be permitted to say that, in my opinion, there are three distinct fallacies in this reasoning', any one of which would subvert it:
“'First — It is not true, according to my humble conception, that the jurisdiction or action of the courts in these cases at all deserves the character imputed to it, of “mere judicial legislation to impair the obligation of contracts in this feature of time.” So far as I know, it has never been placed on that ground. It existed, as the committee acknowledges, when the constitution was adopted, and ‘ ‘must have been familiar to its framers.” No effort was made to restrain it; and hence the inference is irresistible, that no grievance of the sort was imputed to the courts. I have heretofore endeavored to show that this judicial cognizance is predicated in all cases of the faculty of the courts to administer the remedies which the State ordains; and that all contracts are, through necessity, (to use the language of Justice Johnson in Ogden v. Saunders, already quoted), “construed, applied and controlled by the State,” through the medium of its courts. The principles of equity, as administered from the earliest period, will arrest the literal enforcement of a contract, when from the causes assigned — as for a cloud of title, or conflict of encumbrances, &c. — it becomes unconscionable, and is subversive of the true intentions of +he parties. And this, I must say, is the first time I have heard this wholesome jurisdiction of the courts characterized as “judicial legislation to impair the obligation of contracts in this matter of time.”
Secondly — It is not true, that because the courts can administer such relief in certain prescribed cases, the Legislature can be justified by the analogy to assume a wider range by law. It would seem that the fact that the courts can relieve in such cases, instead of justifying the Legislature in such a questionable policy, woxild be a strong motive to restrain such legislation. Inasmuch as some of these cases of hardship are relievable by the courts, the mischief apprehended by the law-makers would, to that extent, be abridged. But the judicial and legislative “functions are, in truth, too dissimilar to justify such an analogy; the courts act upon individual cases and upon proofs and pleadings; the inhibition upon the Legislature proceeds, in a great measure, from its incapacity to act in the premises otherwise than broadcast.
Thirdly — It cannot be said, with propriety, “that the Legislature may, where the necessity for such interference exists, do broadcast what courts do in individual cases.” The very contrary is true. If the assertion was narrowed to the claim to compass by law what courts do in individual cases, the most careless enquirer would be startled by such a pretension, and by the actual obliteration it occasions, of the dividing line between these departments of the government. But the offence is greater when this pretension is so enlarged as to embrace the alleged power to “do broadcast what the courts do in individual cases. ’ ’ It might seem enough to object that the action of the Legislature can never correspond with the action of the courts. The latter, act in modes unknown to the former; and it would be highly improper, if not a usurpation, for the Legislature to attempt to do what “the courts do in individual cases. ’ ’ But what propriety is there in saying that the Assembly is doing only broadcast by a universal suspension of remedies what the courts do in specified instances? In the one case, relief is given because of peculiar circumstances, which will not allow a mere literal fulfillment of a contract to the oppression of one party, and against the presumed pretensions of both; and in the other, no attention is bestowed upon such circumstances but a broadcast dispensation, given to all for a limited time from the obligation of their contracts. For these reasons, I find myself unable to concur with the committee in their conclusions, so far as they involve the limited enquiry I have made into his particular provision affecting sales under deeds of trust.
*1 have now examined the question before us in all the aspects and upon-all the arguments of counsel that it is material to consider. The conclusion to which my reasoning conducts is too apparent to be announced. It only remains for me to notice a consideration that was pressed upon us with much feeling by the counsel, who concluded the argument for the appellant; and I do this to disclaim any insensibility on my part, or that of my associates on this bench, to this appeal. I mean the allusion that was made to the distresses that might ensue upon a decision against this law, unless counteracted here, as it had been elsewhere, by the military authorities. That appeal has not been without its legitimate influence upon us. It has subserved the only proper purpose for which it could have been designed, and that was, to persuade us to the fullest scrutiny, the most patient investigation, and the most careful reflection touching every branch of this important enquiry. Farther than this, it could not avail with this tribunal. No matter what consequences may follow, nor what action may be taken by the military authorities in our present unsettled state, the apprehension of them can not, and ought not to, deter us from the fearless discharge of our responsible duties. But it should not be forgotten, that there are opposite evils of perhaps greater magnitude than those which have been so feelingly depicted and deprecated. It has already been seen how these high constitutional sanctions of private right have no other means of vindication but by the judiciary. Is it not, then, worth while to consider on this side of the question what deplorable calamities, moral and political, might attend the surrender of this last bulwark by its sworn defenders through a subserviency to tern- *620 porary interest or passions; or a timid disposition to sacrifice convictions to motives of expediency? No greater or more enduring misfortune, it seems to me, could befall a people, blessed with a constitutional form of government, than a sacrifice of any of *its fundamental guaranties by that department of its service which, by the nature of its organization and functions, has ever been counted on to uphold with a stern inflexibility private rights and public morals. Great as might be the sufferings growing out of a judicial sentence against this law, and wide-spread as might be the ruin of individuals and the sacrifice of property under it, they are not, for one moment, to be compared with the evils likely to attend the demoralizing example of a judiciary seeking, however covertly, popular favor by some skillfully disguised compromise of its highest and most imperious duty' — that of disdaining every pretext, however plausible, and withstanding every temptation, however strong, to betray, in the slightest particular, the requirements of the State and Federal constitutions. Such a spectacle of weakness and subserviency upon the bench, if it did not shock, would incurably deprave public sentiment; destroy confidence in the administration of the laws; spread corruption through other branches of the public service, and fearfully depress the hopes of the friends of constitutional freedom. And it really seems to me it would only be due to that gracious order of Providence, which overrules evil for good, if these pernicious effects should, indeed, stop here, and not descend to every walk of life and all orders of men, spreading abroad the contagion of dishonesty, weakening respect for law, corrupting the commerce and debauching the morals of society. In view, therefore, of all the considerations that bear upon this case, and the responsibilities that grow out of it, I am constrained, though with diffidence, to follow my clear and un-doubting convictions, which lead me to affirm the decree below.
The other judges concurred in the opinion of Rives, J.
Decree affirmed.